88 N.J. Super. 574 (1965)
213 A.2d 33
WILLIAM R. DONALDSON, GEORGE S. LEISURE AND PETER C. NETLAND, EXECUTORS OF THE WILL OF MARCELLUS HARTLEY DODGE, DECEASED, FRANK D. ABELL, ERNEST C. JOHNSON, JR., CLYDE A. ZUKSWERT, EDWIN J. SAYRES AND PETER C. NETLAND, TRUSTEES OF THE CHARITABLE TRUST KNOWN AND HELD AS THE HARTLEY DODGE FOUNDATION, AND FIDELITY UNION TRUST COMPANY AND PETER C. NETLAND, SUBSTITUTED GUARDIAN OF GERALDINE R. DODGE, PLAINTIFFS,
v.
BOROUGH OF MADISON, A MUNICIPAL CORPORATION, AND ARTHUR J. SILLS, ATTORNEY GENERAL OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided August 6, 1965.
*580 Mr. Clinton J. Curtis for plaintiffs (Messrs. Stryker, Tams & Dill, attorneys).
Mr. Henry W. Pilch for defendant Borough of Madison.
Mr. James S. Oliver, Deputy Attorney General, for defendant Arthur J. Sills, Attorney General of New Jersey (Mr. Arthur J. Sills, attorney).
LONG, J.C.C. (temporarily assigned).
This is an application for instructions by the trustees of a charitable trust and *581 application for approval of the resignation of the donor-trustee who has become mentally incompetent.
Prior to 1932 Geraldine Rockefeller Dodge, a resident of the Borough of Madison, Morris County, New Jersey, proposed to arrange for the construction and maintenance of a municipal building for the borough to be known as the "Hartley Dodge Memorial" as a memorial to her deceased son, Marcellus Hartley Dodge, Jr. Lands were conveyed to the borough and, pursuant to an ordinance adopted by the municipal council on September 12, 1932, Mrs. Dodge caused to be constructed on the lands a large stone and marble building designed for use as a municipal building. By articles of dedication dated May 28, 1935 and recorded in the County Clerk's office, Mrs. Dodge granted the building to the borough, the building to be continuously in the future known as the "Hartley Dodge Memorial" as a memorial to her deceased son for use as a municipal building. Prior to such dedication she executed the trust agreement here in question, dated June 22, 1934, between herself as settlor and seven trustees, who included Mrs. Dodge and her husband, Marcellus Hartley Dodge. The agreement established a charitable trust. It recited that Mrs. Dodge was desirous of creating and establishing an endowment fund to be known and held as the "Hartley Dodge Foundation" for the purpose of maintenance, upkeep and repair of said Hartley Dodge Memorial. By the agreement she granted to the trustees "the trust fund which I am about to create, the transfer of the corpus of said fund to be made by me in payments from time to time to the said trustees until the corpus of said trust fund aggregates the sum of $300,000." The trustees were authorized to invest and reinvest the corpus and to expend the income of the trust in their discretion for the upkeep, maintenance, care and repair of the Hartley Dodge Memorial building, but not for such expenses and disbursements as would and should ordinarily be provided for by the borough, except that in their discretion the trustees might help and/or assist the borough with such expenses, or take over a part or all of the same, if necessary *582 in their opinion. The agreement contained various other provisions in connection with administration of the trust, including a provision that upon the death or resignation of any of the trustees or any successor trustee, a successor trustee should be appointed in writing by a majority of the surviving or remaining trustees, so that there would never be less than five nor more than seven trustees. Mrs. Dodge reserved the right during her lifetime to add to, modify, alter, change or revoke any provision of the agreement and to add new trustees. Thereafter she executed four modification agreements, one of which surrendered her reserved right to revoke the trust.
Shortly after execution of the trust agreement, Mrs. Dodge funded the trust by transferring to it securities in the face amount of $300,000. Since May 30, 1935 the Borough of Madison, its council and various administrative boards and departments, have occupied and used the memorial building for municipal and public purposes. The income from the trust fund has been applied to the maintenance and upkeep of the municipal building, in some instances by the payment of various sums of money by the trust to the borough and in other instances by having certain repairs, improvements and maintenance work arranged for directly by Mrs. Dodge or the trustees.
In the earlier years the trust and its activities were largely under the direction and control of Mrs. Dodge, and the actions taken by the trustees were, in large part, determined by her and consented to by the other trustees. Later Mrs. Dodge's advanced years and illness caused her to limit her activities in the trust and she did not exercise the same degree of control as previously.
With the passage of the years, various trustees died or resigned and succesors were duly appointed in accordance with the trust instrument. On June 18, 1963 Mrs. Dodge was adjudicated a mental incompetent by the Superior Court, Chancery Division, and her husband appointed as her guardian. On October 14, 1963 Mr. Dodge, as guardian, submitted *583 to the trustees the resignation of Mrs. Dodge as a trustee "because of her disability which makes her incapable of continuing to act as trustee," the resignation to take effect immediately. Thereafter the six other trustees, including Mr. Dodge as a trustee and as guardian, instituted this suit for approval of the resignation and for instructions.
On December 25, 1963 Mr. Dodge died. His executors were subsequently substituted in this suit in his place as trustee, and the substituted guardians of Mrs. Dodge were substituted in his place as guardian.
The Borough of Madison and the Attorney General, defendants in the cause, have answered and appeared.
In the first count plaintiffs ask that the resignation of Mrs. Dodge be approved by the court and that she be relieved and discharged from all future liability in connection with the trust. There is no objection by any other party. The request should obviously be granted. Mrs. Dodge is unable to perform the duties of her trust. She and her estate are entitled to be protected against liability for failure to perform duties which she cannot perform. The trust is entitled to administration by active and competent trustees.
It is common practice for trustees to apply to the court for discharge on grounds of age or physical infirmity, and to obtain such discharge subject to the duty to account and pay over. Green v. Blackwell, 31 N.J. Eq. 37 (Ch. 1879); O'Kill v. Campbell, 4 N.J. Eq. 13 (Ch. 1837); In re Loree's Trust Estate, 24 N.J. Super. 604 (Ch. Div. 1953); In re Mild's Estate, 25 N.J. 467, 485 (1957); N.J.S. 3A:11-1. Even more compelling is an application for discharge on grounds of mental infirmity.
There is sufficient reason for the discharge, and it appears the discharge will not be prejudicial to the trust or persons interested therein. Also, the trust agreement itself provides for the possibility of resignations, although it does not specify the method by which a resignation shall be effected or by whom it shall be accepted.
*584 In view of Mrs. Dodge's inability to act for herself it is clearly appropriate for her guardians to submit her resignation and apply for her discharge. She and her guardians will be relieved of any further duties in connection with the trust except the duty to account and pay over the assets with which she is chargeable.
In the second count the trustees seek construction of the trust agreement and directions of the court as to a number of matters concerning the administration of the trust and their duties. There are nine specific questions raised and they will be dealt with separately.
I.
Is this charitable trust governed by the same rules which govern the administration of nontestamentary and testamentary trusts generally?
This question should not be answered. It raises no specific question with which the trustees are confronted and appears to be in substance a request for an advisory opinion. All parties seem to agree that the answer to the question is, in general, affirmative, and the authorities support that view. See Restatement, Trusts, 2d, § 380 (1959); Bogert, Trusts and Trustees (2d ed. 1964), § 391. However, it is the differences that would be important, and it would serve no purpose here to answer the general question.
II.
Are the powers conferred upon the trustees properly exercisable by less than all the trustees in the absence of any provision in the agreement, as modified, expressly authorizing such exercise of their powers?
The answer to this question is "Yes," with some qualifications and admonitions, and represents one of the differences between private trusts and charitable trusts.
*585 The general rule as to private trustees is that they must act unanimously unless otherwise provided in the instrument creating the trust. Restatement, Trusts, 2d, § 194, p. 429 (1959); Daybill v. Lucas, 121 N.J. Eq. 143 (Ch. 1936), reversed on other grounds 121 N.J. Eq. 580 (E. & A. 1936); Hersh v. Rosensohn, 127 N.J. Eq. 21 (E. & A. 1939).
However, in the case of a charitable trust there is an exception to the general rule. "If there are several trustees of a charitable trust, the powers conferred upon them can properly be exercised by a majority of the trustees, unless it is otherwise provided by the terms of the trust." Restatement, Trusts, 2d, § 383 (1959).
The leading text writers uniformly accept the exception to the rule as set forth in the Restatement. See Bogert, Trusts and Trustees (2d ed. 1964), § 391; 4 Scott, Trusts (2d ed. 1956), § 383; Perry, Trusts (5th ed. 1899), § 413; 6 Clapp, Wills and Administration (3d ed. 1962), § 1095; 4 Pomeroy, Equity Jurisprudence (5th ed. 1941), § 1060(a).
While no New Jersey cases have been found dealing with this question, the cases from other states are in accord. City of Boston v. Doyle, 184 Mass. 373, 68 N.E. 851 (Sup. Jud. Ct. 1903); Attorney General v. Olson, 346 Mass. 190, 191 N.E.2d 132 (Sup. Jud. Ct. 1963); Stewart's Estate, 48 Pa. Dist. & Co. R. 526 (1943); Van Horn v. Lewis, 79 F. Supp. 541, 555 (D.C. 1948).
The rule seems to rest largely on considerations of practical convenience and the necessity for reasonable expedition of the affairs of a charitable trust. Boards or bodies of trustees of these trusts tend to larger numbers than private trusts, with a commensurate increase in the difficulty of reaching unanimous decisions and of obtaining full attendance at all meetings.
The Attorney General has expressed some concern that the principle of majority rule not be understood to lessen the fiduciary duty of any individual trustee or group of trustees, or to sanction control of the trust by a majority without the participation or opportunity for participation of *586 the other trustees. No such dilution or sanction is here intended. Every trustee is under a duty to administer the trust as long as he is a trustee, and to participate actively in the performance of the trust. Scott on Trusts (2d ed. 1956), § 169; Speakman v. Tatem, 48 N.J. Eq. 136, 148 (Ch. 1891), affirmed 50 N.J. Eq. 484 (E. & A. 1892). He must exercise ordinary care. Blauvelt v. Citizens Trust Co., 3 N.J. 545, 554 (1950); In re Koretzky's Estate, 8 N.J. 506, 524 (1951). He cannot delegate the administration of the trust, although he may delegate the performance of certain acts. Restatement, Trusts, 2d, § 171, comment (d); Scott, op cit., § 171.1.
These rules apply to multiple trustees as well as a single trustee. Professor Scott says (op. cit., § 184):
"Where there are several trustees it is the duty of each of them, unless it is otherwise provided by the terms of the trust, to participate in the administration of the trust. A trustee is under a duty not to delegate to third persons the doing of acts which he can reasonably be required personally to perform. Similarly a trustee cannot properly delegate the doing of such acts to his co-trustees. It is improper for one of the trustees to leave to the others the control over the administration of the trust. A trustee who remains inactive is guilty of a breach of trust. It is improper for one trustee to leave to the others the custody and control of the trust property. It is the duty of each to use reasonable care to prevent the others from committing a breach of trust; and if one of the trustees commits a breach of trust, it is the duty of the others to compel him to redress it."
These duties are no less where the trust is charitable. A useful statement of the duties of trustees of a charitable trust is set forth in the Restatement, Trusts, 2d, § 379, comment. But the existence of the individual duty is not inconsistent with the principle of majority rule. A trustee in the full performance of his duty can disagree with his co-trustees, but the action of the majority, if otherwise proper, is not rendered improper by reason of the disagreement. What is important, however, is that a trustee shall not ignore his duties and leave the administration of the trust to his fellow trustees, and that a majority shall not exclude any other trustee from participation or an opportunity to participate in the administration *587 of the trust and decisions in connection therewith. Any such exclusion would be inconsistent with the principle of majority rule because that rule presupposes the opportunity of all trustees to participate.
In accordance with the foregoing, it is concluded, as stated by the Attorney General, that in the absence of a contrary direction in the trust instrument, nondelegable powers of the trustees may properly be exercised by majority action of the trustees, provided that all the trustees have participated or have had reasonable opportunity to participate in such action.
It is noted that the trust instrument here specifically provided for two situations in which action was authorized by a majority of the trustees: (1) the selection of a bank to act as depository of the trust assets, and (2) the appointment of successor trustees. This is not construed as manifesting an intention that all other actions must be taken by unanimous vote. These provisions were for special matters concerned with particular items of mechanics, i.e., selection of a bank and successor trustees, not with matters of general administration, and upon a reading of the entire instrument they tend more to confirm an intention of majority rule than to negate it.
III.
Can the trustees adopt rules for the procedures to be followed in exercising such powers as the election of officers, providing for their term of office and their duties, designating the numbers of trustees who shall constitute a quorum, etc.?
The trustees have such powers as are expressly given to them, and also such implied powers as are necessary and appropriate to carry out the purposes of the trust and are not forbidden by the terms of the trust. Restatement, supra, sec. 380.
*588 It is necessary and appropriate that they employ some orderly procedure for the conduct of the affairs and business of the trust. It is not necessary that trustees of a charity sit only at a round table having no head or foot or without one trustee presiding over or guiding the discussion or, for example, putting matters to a vote. It is not necessary that they all keep minutes or the books of account, or take the money to the bank or sign the checks.
If they must employ orderly procedures it is proper that they adopt procedures in a formal written manner in order that all trustees may know what such procedures are and be guided thereby. It is of no moment whether they be called rules and regulations or bylaws. This trust is not a corporation and cannot function as a corporation but it is necessary and appropriate that the trustees adopt procedures and it is wise that they articulate them. Such procedures must, of course, be reasonable and appropriate for the conduct of the business of the trust and consistent with the trust instrument, the trust purposes and the rights and duties of the individual trustees. See Bank of Delaware v. Allmond, 40 Del. Ch. 372, 183 A.2d 188 (1962). Compare Frank v. Clover Leaf Park Cem. Ass'n, 29 N.J. 193, 202 (1959), dealing with a corporate charitable trust. There should be, for example, no unreasonable restriction on the calling of special meetings of the trustees.

Officers
In furtherance of orderly procedure, the trustees may elect officers and prescribe their duties. Obviously, however, such officers cannot be clothed with the authority exercised by similar officers of a private corporation. The designation of officers is mainly for purposes of procedure and they would have authority only for acts of a ministerial nature, since trustees cannot delegate important discretionary powers. Trustees of Rutgers College v. Richman, 41 N.J. Super. 259 (Ch. Div. 1956).
*589 These matters are primarily within the discretion of the trustees, and this court will not undertake to define the duties of various officers or fix their terms of office. City of Englewood v. Allison Land Co., 25 N.J. Super. 466, 471 (Ch. Div. 1953); Judge v. Kortenhaus, 79 N.J. Super. 574, 586 (Ch. Div. 1963).
It is suggested, however, since the trustees are about to consider the adoption of rules and regulations, that elections or appointments be made for not more than one year at a time, since the trustees should have periodic opportunity for review of the functioning of the trust organization at reasonable intervals and there should be no unreasonable hindrance of majority rule.

Quorum
Incidental to efficient and orderly administration the trustees have authority to provide for a quorum of less than all of the trustees for the transaction of trust business. This, again, is a rule of necessity. It must be recognized that not all of the trustees will be able to attend every meeting and that trust action should not be held in abeyance until every trustee can be present. Since a majority may exercise the trust powers, they should not be prevented from taking action because one or more trustees are unable to attend or deliberately remain away from a meeting.
This, of course, is subject to the comment in subsection II hereof, i.e., that all trustees must have reasonable opportunity to participate in the meeting and that all trustees, whether present at a particular meeting or not, continue to be subject to the duties discussed in that subsection. While the number of trustees who may constitute a quorum is in the first instance a matter within the discretion of the trustees, the number may not be less than a majority of all of the trustees in office and, whatever the number required for a quorum may be, action may not be taken without the concurrence of a majority of all of the trustees in office.

*590 IV.
Are the trustees entitled to any compensation for their services, and, if so, are the allowance and payment of such compensation governed by N.J.S. 3A:10-1, 2?
This will not be answered as an hypothetical question but, to the extent that the question is fairly raised by the factual situation and the problems presented, it will be answered.
There is no specific request for the allowance of commissions. However, the trustees have presented and had marked in evidence their books of account, their annual statements of income and expenditures, and an accountant's statement of condition as of December 31, 1963, with a schedule of assets on hand. In effect, the above records together with a statement of financial condition as of January 1, 1958 (prepared at the court's request and marked in evidence) constitute an accounting of the trustees' administration and will be accepted as such for the period from the inception of the trust to January 1, 1958, as set forth in subsection V hereof, infra.
This being so, the case can be held fairly to raise the question of compensation, at least for the period prior to January 1, 1958. In addition, the trustees are faced with the necessity of appointing a successor trustee and require instructions, so far as they may now be obtained, as to the possibility of such successor's being compensated as well as to their own immediate course of conduct as to payment of commissions.
Insofar as this case raises the question of compensation for services prior to January 1, 1958, the trustees are instructed that no commissions may be paid. There is no request for such commissions and none has been taken. There has been and will be no formal accounting for this period. Since there was no suggestion concerning commissions during the period when Mrs. Dodge, the donor, was participating in the administration of the trust (and when she might have made a modification of the trust agreement if so inclined), *591 and since several of the original trustees have died or resigned and been replaced during this period, it is considered under all the circumstances here present that no commissions should be paid for the period and that, by rough analogy to the six-year statute of limitations, the trustees should be considered to have waived any claim to commissions on either income or corpus for this period.
As to the period subsequent to January 1, 1958, other considerations apply. There is no provision in the trust agreement specifically allowing or specifically denying compensation to the trustees. There are no provisions from which it can clearly be implied that there was an intention to allow or deny compensation. There is to be an accounting for the period subsequent to January 1, 1958 as directed in this opinion in subsection V hereof. In the absence of an indication to the contrary in the trust instrument, it is the general rule that trustees of a charitable trust of this type, as well as trustees of private trusts, are entitled to compensation. Restatement, supra, sec. 390; Bogert, supra, sec. 396; Scott, supra, sec. 390.
There seem to be no reported decisions to this effect in New Jersey, but this appears to be the commonly accepted practice in this State on accountings in testamentary charitable trusts, at least as to income commissions. See, for example, Martin v. Haycock, 22 N.J. 1 (1956), where, after the allowance of commissions by the Chancery Division the Supreme Court remanded for entry of a judgment transferring the remainder of the trust fund to Ireland "after the allowance according to law of all proper charges." The same rule should apply as to an inter vivos trust.
In this case a distinction must now be drawn between income commissions and corpus commissions. The only matter properly before the court at this time is the question of income commissions. Assuming for the moment that N.J.S.A. 3A:10-4, (concerning commissions of nontestamentary trustees) and 3A:10-2 (concerning computation of commissions) apply to charitable trusts, it is noted that as to corpus *592 commissions both statutes apply only on the settlement of accounts. By long established practice corpus commissions may be paid only when specifically allowed by the court. In re Locarno B. & L. Ass'n, 127 N.J. Eq. 509, 510 (Ch. 1940). Consequently, no determination will now be made as to corpus commissions.
As to income commissions, it has been stated above that according to the general rule and the accepted practice, income commissions may be paid to trustees of a nontestamentary charitable trust. The specific question remains whether such income commissions are governed by that portion of N.J.S. 3A:10-2 which provides:
"On the settlement of accounts of fiduciaries acting in any capacity referred to in section 3A:10-1 of this title, their commissions over and above their actual expenses shall be computed upon the following rates:
On all income that comes into their hands, 6% without court allowance. * * *"
A technical argument can be made that the provision of 3A:10-2 permitting income commissions "without court allowance" does not apply to a nontestamentary trust because N.J.S. 3A:10-4, which provides for allowance of commissions to nontestamentary trustees, specifically provides that such commissions shall be allowed by the court "on the settlement of the account." However, the commissions to be allowed (in the absence of any express provision concerning compensation in the trust instrument) are "commissions in accordance with this chapter," i.e., chapter 10 of Title 3A. Commissions in accordance with chapter 10 means the commissions referred to in N.J.S. 3A:10-1 and 3A:10-2. 3A:10-2 itself has an inconsistency because it also begins, "On the settlement of accounts of fiduciaries [etc.]," and then provides for commissions as follows: "On all income that comes into their hands, 6% without court allowance." In other words, the restriction "On the settlement of accounts of fiduciaries" in 3A:10-2 does not apply to income commissions. Are the words any stronger or more restrictive when they are used in *593 N.J.S. 3A:10-4? I think not, and conclude that the allowance of commissions to nontestamentary trustees by 3A:10-4 "in accordance with this chapter" includes commissions on income without court allowance on nontestamentary trusts if the trustees are otherwise entitled to such commissions, as here.
As to the rate of income commission, 3A:10-2 is clearly applicable to nontestamentary trusts. It is also concluded that the rate is applicable to income commissions on charitable trusts. It has been concluded above that trustees of a charitable trust, in the absence of an indication to the contrary in the trust instrument, are entitled to compensation for their services. This being so, there appears no reason why this provision of the statute should not apply to charitable trusts, and it is concluded that they are within its purview.
It is not intended by the above to indicate that rates of corpus commissions provided by N.J.S. 3A:10-2 are necessarily applicable to charitable trusts. First, the matter of corpus commissions is not now before the court. Secondly, there may be some doubt about the matter. There may be considerations affecting corpus commissions which are not present in a determination of the subject of income commissions and it is therefore believed that a construction of the statute to include charitable trusts as to income commissions does not require an implication that they are included in the provisions as to corpus commissions also.
The present trustees make no claim for corpus commissions and present no argument in support thereof, but in reviewing the law for the benefit of the court state as a possibility:
"* * * [I]t could be argued that the trustees are not entitled to any corpus commissions on the grounds that such commissions are computed and due at the time the trust is terminated. While N.J.S.A. 3A:10-2 authorizes payment of commissions on the settlement of accounts, such payments are normally kept small if the account is an intermediate account, and all such amounts paid on intermediate accounts are deducted from the ultimate commission allowed on the final account. In the case of a charitable trust designed to continue in existence in perpetuity, no final corpus commission will be authorized, *594 thus, no partial payments on account of corpus commissions should be authorized."
The Attorney General takes the position that corpus commissions may not be allowed. He adopts the above argument of the trustees' counsel and concludes:
"The Attorney General would have no objection to having the trustees compensated for their services, if compensation is requested, provided that such compensation is limited to funds arising out of income."
Counsel for the Borough of Madison passed the question until presented by an accounting.
It is further noted that some of the provisions of N.J.S. 3A:10-1 and 2 may be inconsistent with the concept of corpus commissions on perpetual charitable trusts. Thus 3A:10-1 provides that corpus commissions shall be allowed with respect to pains, trouble and risk in "settling the estate" rather than in respect to its quantum. N.J.S. 3A:10-2 authorizes an additional commission of 1% for each additional fiduciary and, after 25 years, an additional commission of 1/5 of 1% for each year. Such commissions could unreasonably deplete a trust intended to be perpetual.
In view of the above considerations, the position of counsel and the Attorney General and the fact that a contrary view is held by some members of the bar and in banking circles, it is suggested that the matter is appropriate for consideration by the Legislature.
V.
Are the trustees required to file periodic accounts with this court, and, if so, how often should such accounts be filed?
In the absence of an application to the court by the Attorney General or a beneficiary with sufficient interest to induce the court to act, the trustees of this nontestamentary *595 trust would not be required to file period accounts with the court. There is no requirement in the trust instrument for court accountings. N.J.S. 3A:9-3, as amended, provides generally that a "guardian or trustee" shall settle his account in the Superior Court or if he was appointed by or received his letters from the Surrogate or County Court, then in the County Court once in three years, but the history and the language of the statute and its predecessors indicate that this does not apply to nontestamentary trustees. Moreover, if it were construed to apply to such trustees, there would be an inconsistency between N.J.S. 3A:9-3 and 3A:9-10. The latter statute provides that any nontestamentary trustee shall have the right from time to time to settle his intermediate and final accounts in the County Court. N.J.S. 3A:9-3, which requires guardians and trustees to settle their accounts once in three years, provides that only trustees who were appointed by or received their letters from the surrogate or County Court shall settle their accounts in the County Courts. If N.J.S. 3A:9-3 should be construed to apply to nontestamentary trustees, why does it restrict the required accountings in County Courts to cases where the trustee was appointed by or received his letters from the surrogate or County Court? The answer must be that that statute does not apply to nontestamentary trustees; that such trustees are regarded as in a separate category, and that accountings by them are not required at periodic intervals but are in the nature of a privilege or a right. The entire treatment of accountings by nontestamentary trustees appears to be on a permissive basis. Thus in In re Rothenberg's Trust, 129 N.J. Eq. 377 (E. & A. 1941), the court said that the trustee of an inter vivos trust had a right to setle his account in a court of equity and secure periodic repose by so doing. The statute, N.J.S. 3A:9-10, is stated in terms of a right rather than an obligation. See also United Towns B. & L. Ass'n v. Schmid, 23 N.J. Super. 239 (Ch. Div. 1952); Camden Trust Co. v. Cramer, 136 N.J. Eq. 261, 272 (E. & A. 1944). In addition, the court rules distinguish nontestamentary trusts and make *596 separate provisions therefor. R.R. 4:105-2 and 4; 4:100-2; 5:3-1; 5:3-6(c).
Of course, the trustees have the duty to keep clear and accurate accounts and to give to the beneficiary, at reasonable times, complete and accurate information as to the trust property; to permit inspection of the trust property and accounts and vouchers, and they may be compelled to render an accounting upon proper proceeding by a beneficiary. United Towns B. & L. Ass'n v. Schmid, supra. This applies to a nontestamentary charitable trust as well as a private trust; the right may be enforced by the Attorney General. Bible Readers' Aid Society v. Katzenbach, 97 N.J. Eq. 416 (Ch. 1925). In view of the special nature of this trust and the special interest of the Borough of Madison, it would seem the right may be enforced by the borough also. Or, if satisfied with informal accountings and that the records are properly kept and the administration satisfactory, the Attorney General and borough could waive formal accounting. Bible Readers' Aid Society v. Katzenbach, supra.
In this case there was application for the discharge of Mrs. Dodge as trustee. As stated above, such discharge is subject to the duty to account and pay over. Such accounting is a natural requisite to discharge of a trustee. Bible Readers' Aid Society v. Katzenbach, supra. At the hearing of this matter the trustees submitted records and statements of their administration, as set forth in subsection IV hereof. The court stated at the original hearing that it was generally satisfied with the proofs submitted and that it was deemed impractical and unnecessary to require a formal accounting for the entire period of the trust. The court therefore requested that the trustees have their accountant prepare and submit a statement of the condition of the trust as of January 1, 1958, based upon the proofs submitted in evidence, to the end that if such statement should be satisfactory to the court, the Attorney General and the Borough of Madison, it could be accepted as a starting point for a formal accounting for the period subsequent to January 1, 1958. Such a statement was *597 prepared, verified and submitted in evidence. No objections have been made by the Attorney General or the borough. It is therefore considered that the proofs constitute a sufficient and satisfactory accounting for the period from inception of the trust to January 1, 1958, and that no formal accounting should be required for that period. Bible Readers' Aid Society v. Katzenbach, supra.
It is further considered, in view of the nature of this trust, the public interest therein, the domination to some extent of the trust by Mrs. Dodge and her present discharge, that the best interests of the public, the borough, Mrs. Dodge and the other trustees now require a formal accounting from January 1, 1958 to the date of Mrs. Dodge's discharge. It is therefore directed that such accounting be submitted.
VI.

Are the trustees authorized to accept gifts, bequests or devises from the settlor or other persons to be held, administered and distributed as corpus or income of the trust?

This question will not be answered in the general form in which it is put. It well may be that trustees of a charity such as this would not be authorized or required to accept all gifts, of whatever nature or amount, by whosoever should choose to make a gift to this trust, and no decision is made thereon. It may be that additional gifts by other persons would change the nature of the trust, enlarge its scope beyond that contemplated by the original donor, or in some manner defeat or thwart the essential purpose of the donor. Consequently, no decision should be made on the general question.
The immediate questions concern various additional gifts made by Mrs. Dodge and also a bequest in the will of her husband Marcellus Hartley Dodge to the "Trustees of the Hartley Dodge Foundation."
*598 The original trust agreement provided, in part, as follows:
"I, GERALDINE R. DODGE, hereby grant, pay over and transfer to the said Trustees of The Hartley Dodge Foundation the Trust Fund which I am about to create, the transfer of the corpus of said Fund to be made by me in payments from time to time to the said Trustees until the corpus of said Trust Fund aggregates the sum of Three Hundred Thousand Dollars, IN TRUST, however for the following * * *."
The trust was originally funded with $300,000 face amount of bonds. subsequently, Mrs. Dodge, considering the income insufficient, made additional gifts to the trust fund of 164 shares of Standard Oil Co. (N.J.) common stock on December 14, 1955, and 550 shares of General Motors Corp. common stock on December 13, 1956. The trustees were clearly authorized to accept these gifts as additional corpus. The $300,000 amount stated in the original trust agreement was not a maximum or a limitation; it was a statement of her present intention, and there is no reason to conclude there was any intention to restrict the trust forever to the amount named.
In the meantime, and on November 15, 1950, Mrs. Dodge had assigned to the trust an 8% interest in the income of an inter vivos trust created by her on August 26, 1918 and held by City Bank Farmers Trust Co. This income was to be payable during Mrs. Dodge's lifetime. From this source the charitable trust received approximately $10,000 a year for several years; for the last three years the proceeds have been over $13,000 a year. Since the assignment the trustees have allocated these receipts to income and used them as such. This appears to have been in accord with the intention of the donor, and it is concluded that the trustees had authority to accept this gift and to apply it as stated.
From time to time Mrs. Dodge made additional gifts to the trust, either by paying directly certain obligations or expenses incurred by the trust or by transferring cash to the trust for specific purposes in connection with the repair or maintenance of the municipal building. For example, in 1963 Mrs. Dodge gave the trust $9,312.80 for certain work which had been *599 undertaken on the building. It is noted that the trust ended the year with an income cash balance of only $1,240.36. The acceptance and application of these additional gifts was within the authority of the trustees.
As to the bequest of $300,000 in the will of Marcellus Hartley Dodge, deceased, the trustees have indicated that they wish to accept the gift, if they may legally do so. While, as stated, the court is not willing to adopt a rule that the trustees are authorized to accept any and all gifts to the trust, it is concluded that this gift may properly be accepted. The matter is not settled by N.J.S. 3A:3-16.1 et seq., which provides that a bequest by a testator's will to a trust is valid if the trust is identified in the will and its terms are set forth in a written instrument executed prior to the will. That statute seems primarily concerned with the validity of the disposition from the point of view of the testator whose will is under consideration. The statute would not necessarily make valid, or mandatory upon the trustees, a gift which the receiving trust could not properly accept.
However, as stated, the dollar amount stated in this trust instrument was not a mandatory limit. The donor herself made additional gifts to corpus and on several occasions found it advisable to supplement the income in order to carry out the purposes of the trust. It is further noted that the income from the trust held by City Bank Farmers Trust Co. is to cease upon the death of Mrs. Dodge. The building is getting older, and it is well known that building costs and the expense of repairs and maintenance have increased substantially in recent years. In view of the above factors it is concluded that a gift which does not change the nature of the trust, unreasonably enlarge its scope, or thwart or defeat its essential purpose, and which in amount is in reasonable proportion to the requirements of the trust, is within the authority of the trustees and they should be authorized to accept the bequest in Mr. Dodge's will and hold and use the same in accordance with the trust instrument.

*600 VII.
If this court approves the resignation of Geraldine R. Dodge as trustee, are the substituted guardians of the person and property of said Geraldine R. Dodge required to join in filing an account of the administration of the trust for the period prior to the termination of her trusteeship?
Since the resignation of Mrs. Dodge has been accepted and she is to be discharged as a trustee, her substituted guardians, as an incident to her discharge, should join in the accounting. If for any reason they should decline to join as plaintiffs, they should be joined as defendants.
VIII.
If this court approves the resignation of Geraldine R. Dodge as trustee, are a majority of the remaining trustees empowered to appoint a successor trustee under the terms of said agreement?
The trust agreement provides as follows:
"AND it is further agreed that upon the death or resignation of any of said trustees or any successor trustee, a successor trustee shall be appointed in writing by a majority of the surviving or remaining trustees and successor trustees, so that there shall never be less than five nor more than seven trustees."
The resignation of Mrs. Dodge having been accepted, a majority of the remaining trustees are authorized to appoint a successor trustee. No reason appears for the intervention of the court in the appointment. In re Sotnikoff, 34 N.J. Super. 422 (App. Div. 1955).

*601 IX.
Are the executors of the last will and testament of Marcellus Hartley Dodge, deceased, required to join in filing any account of the administration of the trust for the period prior to the death of said trustee?
The direction to file an accounting for the period subsequent to January 1, 1958 in subsection V hereof applies to all persons who were trustees during that period. They are responsible to account and their interests will be affected by such accounting. The executors of Mr. Dodge should therefore join in the accounting. If for any reason they decline to do so, they should be joined as defendants.
A form of judgment may be submitted in accordance with this opinion.